IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14–CR–30164–MJR |
| | ) | |
| DARRELL WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER

**REAGAN, Chief Judge:**

In August 2014, law enforcement officers procured an arrest warrant for Herman Smith, Jr., who is not a party to this case.[1]  Smith resided at 1516 Second Street in Madison, Illinois.  Unbeknownst to the officers, that address comprised three residences: a traditional single-family ranch house facing the street, plus two units (one upstairs, one downstairs) in a detached, two-story apartment building at the back of the property.  Smith lived in the downstairs apartment in the freestanding building.

Darrell Williams, the instant Defendant, lived in the upstairs unit. Officers—after ingress into the single-family home (with those residents' consent) and discovering the existence of the second building—entered Defendant's residence.  It is undisputed officers had neither a warrant to search Defendant's

---

[1] In Case No. 14–CR–30162–NJR, Mr. Smith is set for a jury trial (on two counts of distributing a controlled substance) before District Judge Rosenstengel on May 6, 2015.

residence nor a warrant to arrest him.  Once inside, officers discovered over 500 grams of crack cocaine.

Defendant, who has been indicted of possession with intent to distribute those drugs, has moved to suppress the evidence as unconstitutionally obtained. For the reasons explained below, Defendant's motion (Doc. 26) is GRANTED.

## BACKGROUND

Unless otherwise noted, the facts are undisputed.

By the summer of 2014, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") had opened an investigation into Herman Smith, Jr., whom officers suspected of dealing crack cocaine.  Agents initiated a series of three controlled buys, where a confidential informant ("CI") and Smith were recorded exchanging money for crack.  During the first buy, Smith arrived in a blue Chevrolet Impala.  Agents who ran the Impala's plates determined it belonged to Smith, whose address was listed as 1662 Second Street, Madison, Illinois.  All three buys occurred on the 1600 block of Second Street.  In total, the CI bought over 150 grams of crack from Smith.

Smith was indicted, and agents procured a warrant for his arrest.  Officers had a driver's license photo[2] of Smith and two addresses for him: 1662 Second Street, and 1516 Second Street.  How they discovered the latter address is not a matter of record.  During the week prior to serving the warrant, officers noted the Impala registered to Smith was parked more frequently in front of the 1516

---

[2] Agent Inlow, the team leader for serving Smith's warrant, had worked surveillance during the controlled buys, but was a couple of blocks away during each of them.  It is unclear whether he had actually seen Smith before serving the arrest warrant.

address, so they approached that address first: at approximately 6:00 a.m. on August 28, 2014.

From the street, officers—between six and nine local and federal police comprised the arrest team—could see a ranch-style home that appeared to be a single family residence. The blue Impala was parked on the street in front of the house. Most of the officers approached the front door; two were stationed behind the property, in an alley behind the two-story building that abutted the property line.

Officers, announcing they had a federal arrest warrant for Herman Smith, knocked and announced their presence. Rochelle Williams-Gardner ("Gardner"), who had lived at 1516 Second Street since 1991, opened the door. Gardner—sister to both Smith and to the instant Defendant—informed officers that Smith did not live with her, and consented to a search of her house. When asked if Smith lived there occasionally, she told officers no—but that sometimes he *did* stay with her son in the two-story building at the back of the property. There is some disagreement as to whether she told officers Smith simply lived in the freestanding building, or, more specifically, that he lived *downstairs* out back. Though the Court found Gardner's testimony credible, a finding of fact on that particular conversation is unnecessary, since officer's eventual entry into Defendant's upstairs apartment was unreasonable in either case. *See* FN 9, *infra.*

Leaving one officer inside with Gardner (and her husband and son), agents walked into the backyard, where they could see the freestanding building. From

3

across the yard, their view of the lower level was obscured by a hedge.  But they could see two upstairs windows and an external stairway leading to a second-story door on the left side of the building.  While talking amongst themselves, agents saw an African-American man peek through a window.  According to ATF Agent Matt Inlow ("Inlow," the arrest team leader), agents were 40 to 50 feet away at the time, and the peek through the window lasted at most one or two seconds.  The upstairs lights were not on, and dawn had not broken: Inlow claims an internet search revealed a 6:19 a.m. sunrise that day.

Believing the peeking head belonged to Herman Smith, Inlow—within a matter of seconds—led a team to the outside stairs.  On approaching the building, officers passed the hedge and saw a downstairs door close to the bottom of the stairs.  Two officers were left to cover the downstairs entrance, and approximately five officers ascended to the door upstairs.  Inlow saw no apartment numbers on the building, but admitted the building's "layout gave us pause," and that "we had no idea if it was one, two, three or four" residences.  "[W]e had no idea what the layout of the building was."

Officers in the back alley—a short distance around the corner from the five officers on the landing—saw no exits in that direction, so (as Inlow ceded) nobody from inside the building could have possibly escaped.  According to Gardner, anyone standing in the alley behind the freestanding building could have also seen the building had two sets of utility meters.

Inlow knocked and announced, and after twenty or thirty seconds—enough time for an officer to go downstairs for a ram—officers forced entry into the apartment. Inlow testified he would not have entered the apartment but for his belief that Herman Smith was inside and—based on "training and experience with narcotics violations"—a belief he was destroying evidence.

Officers did not, however, hear any suspicious sounds before entering the unit. Rather, *after* entry and during a sweep of the residence, officers heard a running toilet. Closer examination revealed over 500 grams of crack, some of which was in that toilet. Officers secured the floating drugs, then procured a search warrant for the rest of the apartment. Of course, they also found the instant Defendant, Darrell Williams, who lived in that upstairs apartment. Agents—thinking they were arresting Herman Smith, Jr.—arrested Defendant Williams during their initial protective sweep. Williams adamantly maintained (and officers soon discerned, after Smith looked through a *downstairs* window, slammed a door, and was quickly arrested) he was not the target of the arrest warrant. Discovery of the drugs and discovery that officers had entered the wrong residence were roughly contemporaneous, but both happened *after* the critical juncture in this case: the ultimate question is whether, based on the facts available to them, officers' entry into Defendant's apartment was constitutional.

Defendant moved to suppress, the Government responded, and the undersigned held a hearing on the matter. Rochelle Gardner and several law enforcement officers, including Inlow, testified. After a thorough review of the

5

evidence, the arguments, and legal precedent, the Court GRANTS the motion for the reasons explained below.

### LEGAL STANDARD

The right of a man in his own home to be free from unreasonable governmental intrusion "stands at the very core of the Fourth Amendment." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). *Accord U.S. v. U.S. Dist. Court for Eastern Dist. of Mich., Southern Div.*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). Searches and seizures inside a home without a warrant[3] are, therefore, presumptively unreasonable. *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011); *Payton v. New York*, 445 U.S. 573, 586 (1980).

That presumption can be overcome when the occupant consents to entry, or where police are faced with exigent circumstances like "hot pursuit," a suspect's potential escape, injury (or danger of injury) to an occupant, danger posed by the occupant to others, or the imminent destruction of evidence. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). The government carries the burden pointing to some affirmative sign of exigency. *U.S. v. Delgado*, 701 F.3d 1161, 1165 (7th Cir. 2012). Key to the inquiry is whether it was reasonable for officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant. *Sutterfield*, 751 F.3d at

---

[3] The Fourth Amendment unambiguously states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." **U.S. Const. amend. IV.**

557.   The exigent circumstances exception applies in the contexts of home entries otherwise requiring authorization via arrest warrant, *Hawkins v. Mitchell*, 756 F.3d 983, 991–92 (7th Cir. 2014), or via search warrant, *King*, 131 S.Ct. at 1856.

The distinction between search and arrest warrants is seldom discussed, but rears its head in this case.  Search warrants must be supported by a magistrate's probable cause determination and must describe—with particularity—the place to be searched.  *Guzman v. City of Chi.*, 565 F.3d 393, 396 (7th Cir. 2009).  Even if a search warrant is valid when issued, it cannot be executed by persons who know (or should know) it is ambiguous.  *Id.*; *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).[4]

In the context of an arrest warrant, though, the Fourth Amendment's particularity requirement is satisfied simply where it names the person to be arrested.  *Powe v. City of Chi.*, 664 F.2d 639, 645–46 (7th Cir. 1981) (discussing the "West rule," which derives from *West v. Cabell*, 153 U.S. 78 (1894): "truly nam[ing]" the arrestee is the "point of reference for adjudging the particularity of [an arrest] warrant.").  And where police have secured a valid arrest warrant, they carry with it the "limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect is within."  *U.S. v. Jackson*, 576 F.3d 465, 468 (7th Cir. 2009) (quoting *Payton*, 445 U.S. at 602) (emphasis here).  According to the rule in *Payton*, in order to properly execute an arrest warrant inside a dwelling, an officer

---

[4] Neither party here spills much ink on the distinction between search and arrest warrants, but Defendant—invoking cases like *Maryland v. Garrison* and *Jones v. Wilhelm*—strikes much closer to the heart of the matter than does the Government, which focuses (incorrectly, as discussed below) on the exigent circumstances exception to the warrant requirement.  Though neither party argues from the precisely correct legal vantage point, their evidentiary submissions and logic are premised on the objective reasonableness of officers' actions, thereby creating a sufficient record on which to rule.  *See Medlock v. Tr.'s of Indiana Univ.*, 738 F.3d 867, 873 (7th Cir. 2013) (citing *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011)) ("[R]easonableness is the touchstone of the Fourth Amendment.").

must (1) enter the dwelling where the suspect lives, and (2) have reason to believe the suspect is at home. *Payton*, 445 U.S. at 603.

The Supreme Court has clarified, though, that an arrest warrant does not carry the authority to enter the homes of third parties (i.e., people, like the instant Defendant, not named in the arrest warrant). *Steagald v. United States*, 451 U.S. 204, 214–16 (1981). *Accord Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011) ("[A]n arrest warrant does not give police carte blanche to enter any dwelling in search of the object of the warrant").

In *Steagald*, the Supreme Court considered a case where agents relied on an arrest warrant as legal authority to enter the home of a third person based on a belief that their suspect (i.e., the warrant's target) might be a guest there. After entering the home, officers found cocaine. *Steagald*, 451 U.S. at 206. A resident (Steagald) was arrested and moved to suppress all evidence uncovered after agents' entry into the home. *Id.* The home entry was held to violate Steagald's Fourth Amendment rights. *Id.* at 222.

The *Steagald* Court focused on the warrant requirement's demand that probable cause to enter a residence be determined by an independent judicial officer, not by "an officer engaged in the often competitive enterprise of ferreting out crime," who "may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interest in protecting his own liberty and the privacy of his own home." *Id.* at 212. Thus, where officers entered the wrong home in the absence of consent or exigent

circumstances, an arrest warrant (naming a non-occupant) was held inadequate for the purposes of protecting the occupant's Fourth Amendment interests.  *Id.*  The Court likened the third-party's privacy interests to those protected by search—not arrest—warrants:

> …while an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ.  An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure.  A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police. … [W]hile the [arrest] warrant in this case may have protected [the defendant] from an unreasonable seizure, it did absolutely nothing to protect [his] privacy interest in being free from an unreasonable invasion and search of his home.

*Id.* at 212–13.  "Regardless of how reasonable [the officers'] belief might have been, it was never subjected to the detached scrutiny of a judicial officer."  *Id.* at 213.  *See also* 3 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 6.1(b), at 373–74 (5th ed. 2012) (hypothetically, in a case where *Steagald* applies, "must the police have an arrest warrant *and* a search warrant? Some language in *Steagald* suggests the answer is yes.").

Though *Steagald* seems to lay down a categorical rule—that when it comes to executing an arrest warrant, an *officer's* determination of reasonableness to enter a home is *per se* inadequate to protect a *third-party's* Fourth Amendment interests[5]—

---

[5] To reiterate: the exigent-circumstances exception does protect the ability of officers on the scene to make split-second decisions, and to enter even a third-party's home if needed.  ***See Steagald***, 451 U.S. at 221–22 ("[T]he exigent-circumstances doctrine significantly limits the situations in which a

federal caselaw has evolved otherwise.  In an unpublished opinion, the Seventh Circuit Court of Appeals boiled the analysis down to two parts: (1) were officers sufficiently certain that the residence they searched was that of the suspect; and (2) were officers sufficiently certain that the suspect would be found there at the time of the search.  *Covington v. Smith*, 259 F. App'x 871, 873–74 (7th Cir. 2008).[6]  Here the second prong is easily met: officers saw that someone was home at 6:00 a.m. on a workday, and Smith's car was parked on the street.  *See U.S. v. Bervaldi*, 226 F.3d 1256, 1267 (11th Cir. 2000) (several vehicles parked at the residence at 6:00 a.m., and "officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule").  So the case hinges on whether officers were sufficiently certain that the residence they were entering was Smith's.

The requisite level of certainty is a matter that has split the federal circuits. The Seventh Circuit ducked the issue in 2008's *Covington*, but in dicta noted the

---

search warrant would be needed.  For example, a warrantless entry of a home would be justified if the police were in "hot pursuit" of a fugitive.  Thus, to the extent that searches for persons pose special problems, we believe that the exigent-circumstances doctrine is adequate to accommodate legitimate law enforcement needs.").

[6] Older Seventh Circuit precedent applies *Steagald* more straightforwardly, and does not allow inquiry into officers' beliefs about who resided where.  In *U.S. v. Patino*, police entered a third party's home because they thought a fugitive might be present.  *Patino*, 830 F.2d 1413, 1414–15 (7th Cir. 1987).  The Court of Appeals started and ended the analysis by noting *whose residence* had been entered, not what officers believed about the residence they were entering.  *Id.* at 1415.  "[T]he presence of an arrest warrant naming [the suspect] would not alter the constitutionality of the entry of [the defendant's] house without a search warrant because *Steagald* holds that would be insufficient vis a vis [the defendant]."  *Id.*  It is unclear to the undersigned whether the current approach undermines rather than augments *Steagald*, but in light of *Covington* and the appellate decisions cited herein (all postdating *Patino*), the Court feels it prudent to analyze this case (in the alternative) under both *Steagald*'s plain language and the more modern regime.  *See U.S. v. Jackson*, 576 F.3d 465, 468 (7th Cir. 2009) (nearly every court of appeals to consider the issue has held that an arrest warrant and search warrant are not both required to enter a third party's residence).

majority of circuits have held "only a reasonable belief—a standard easier to satisfy than probable cause—is required to be sure that the residence to be searched is that of the suspect named in the arrest warrant." *Covington*, 259 F. App'x at 874. A review of the caselaw reveals that majority still holds. *Compare Solis-Alarcón v. United States*, 662 F.3d 577, 580 (1st Cir. 2011); *U.S. v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999); *U.S. v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011); *U.S. v. Barrera*, 464 F.3d 496, 500–01 (5th Cir. 2006); *El Bey v. Roop*, 530 F.3d 407, 416  (6th Cir. 2008); *U.S. v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014); *U.S. v. Hutchinson*, 573 F.3d 1011, 1023 (10th Cir. 2009); *U.S. v. Bennett*, 555 F.3d 962, 964–65 (11th Cir. 2009); *U.S. v. Taylor*, 497 F.3d 673, 678 (D.C. Cir. 2007) (all "reason to believe" or "reasonable belief" cases); *with United States v. King*, 604 F.3d 125, 137 (3d Cir. 2010); *and Motley v. Parks*, 432 F.3d 1072, 1087 (9th Cir. 2005) (*en banc*) (probable cause cases). But merely counting the number of circuits on one side or the other is not necessarily the best way to divine a rule, especially since, as the Fourth Circuit has commented, several circuits have hedged that "reasonable belief" is the same as—or so similar to as to be indistinguishable from—probable cause.  *Hill*, 649 F.3d at 262–63 (collecting cases).

Further muddying the water is dicta from a post-*Covington* Fourth Amendment case, *U.S. v. Jackson*.  The Seventh Circuit hinted that—if push ever came to shove—it might consider "reasonable belief" synonymous with probable cause. *Jackson*, 576 F.3d at 469. *Jackson*'s discussion of the two phrases came in the context of the second prong (i.e., whether officers have reason to believe a

suspect is present), and included an observation that—regardless of the standard chosen—many courts found that the officers' degree of suspicion satisfied the higher, probable cause standard. *Id.* at 469 n. 4.

In light of the Seventh Circuit's discussion in *Jackson*, the undersigned concludes probable cause is the better of the two standards. As the Court of Appeals hinted, courts' typical findings that officer suspicion satisfies probable cause *in addition to* "reasonable belief" makes the lesser standard part of broadly-cited dicta, not reasoning essential to the outcome. ***Id.  See also Tate v. Showboat Marina Casino P'ship***, 431 F.3d 580, 582–83 (7th Cir. 2005). More convincing is the notion (favorably imported from the Sixth Circuit's Judge Clay) that "the Supreme Court tends to use phrases like 'reasonable grounds for belief' as 'grammatical analogues' for probable cause." ***Jackson***, 576 F.3d at 469 (citing ***U.S. v. Pruitt***, 458 F.3d 477, 490 (6th Cir. 2006) (Clay, J., concurring) (citing cases)) (internal quotation marks omitted). As an example, the Seventh Circuit pointed to *Maryland v. Pringle*, where the Supreme Court "appears to use 'reasonable belief' to *define* probable cause." ***Jackson***, 576 F.3d at 469 (citing *Pringle*, 540 U.S. 366, 371 (2003)) (emphasis there). In other words, in the context of arrest-warrant-wielding officer entry into a third-party's home, reasonable belief and probable cause amount to the same thing. Rather than reinforce the semantic chasm, the undersigned will apply the probable cause standard.[7]

---

[7] As noted above, the undersigned reads post-*Steagald* caselaw as coming dangerously close to ignoring altogether *Steagald*'s concerns about officer objectivity. Applying a higher probable cause standard avoids the doubly incongruous result of allowing entry into third-party residences based on a level of belief that is actually lower than the probable cause needed to procure a warrant in the

Given the dearth of binding Seventh Circuit caselaw on the matter, a review of persuasive authority from other circuits helps illuminate the contours of probable cause in the home entry context. Officers may consider reliable information from an informant pointing to a specific apartment, *U.S. v. Lautner*, 57 F.3d 212, 215 (2d Cir. 1995); *U.S. v. Barrera*, 464 F.3d 496, 500–01 (5th Cir. 2006); documentary evidence like city records, credit card applications, and utility bills (or even Google Maps), *Barrera*, 464 F.3d at 501–02 (5th Cir. 2006); *U.S. v. Shaw*, 707 F.3d 666, 668 (6th Cir. 2013); and of course direct surveillance, *Barrera*, 464 F.3d at 498 n. 1. But evidence casting doubt on whether a suspect resides in a certain place must also be considered. *See U.S. v. Hardin*, 539 F.3d 404, 423 (6th Cir. 2008).

Officers must take steps to reasonably ensure they are not entering the wrong home when they execute an arrest warrant. *Shaw*, 707 F.3d at 668 (citing *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008)). The rich history of mistaken-address search warrant cases informs the bounds of reasonableness here. Searching two or more apartments in the same building is no different than searching two or more completely separate houses. *Jacobs v. City of Chi.*, 215 F.3d 758, 767 (7th Cir. 2000). Where officers discover information that makes a warrant's description of a particular residence ambiguous, that warrant is no longer valid, and cannot be executed by officers knowing about that ambiguity. *Jones v. Wilhelm*, 425 F.3d 455, 463 (7th Cir. 2005). Absent exigent circumstances, the Fourth Amendment prohibits an officer from applying earlier surveillance and

---

first place. *See Steagald*, 451 U.S. at 213 ("Regardless of how reasonable [the officers'] belief might have been, it was never subjected to the detached scrutiny of a judicial officer.").

subsequent deductions to resolve probable cause on his own: the "determination of which apartment [merits a constitutionally acceptable search] constitutes an evaluation of probable cause that the Fourth Amendment requires be left to the magistrate absent exigent circumstances." *Id.* at 463–64.  If an officer "obtains information while executing a warrant that puts him on notice of a risk that he could be targeting the wrong location, then the officer must terminate his search." **Id. at 464.  *Accord Maryland v. Garrison*, 480 U.S. 79, 86–87 (1987) (officers who knew or *should have known* that what they thought was one apartment was two would have been obligated to stop search).**

The Seventh Circuit has, for example, held a search unconstitutional where officers should have known a building that (from a distance) looked like a single-family home was in fact a multi-unit building.  **Guzman v. City of Chi., 565 F.3d 393, 396–98 (7th Cir. 2009).**  In *Guzman*, officers (who acknowledged they were under no time pressure to execute a warrant) approached a two-story building that—once they approached it—had the trappings of separate units, including outside access to a second-floor apartment.  *Id.* at 397–98.  Though officers initially "thought the building looked like a single-family house, they should have known pretty quickly that their belief was mistaken."  *Id.* at 397.  "So informed, they should have called off the search."  *Id.* at 398.  **See also Hartsfield v. Lemacks, 50 F.3d 950, 955 (11th Cir. 1995) ("Given the *per se* rule against warrantless searches and the guidance of the *Garrison* court's description of reasonable police efforts, all reasonable police officers should have known that … searching the wrong residence**

14

when [they] had done nothing to make sure [they were] searching the house described in the warrant ... violated the law."); *U.S. v. Hinton*, 219 F.2d 324, 326 (7th Cir. 1955) ("[S]earching two or more apartments in the same building is no different than searching two or more completely separate houses...[P]robable cause must be shown for searching each *residence*.") (emphasis here).

The facts and circumstances within the knowledge of the law enforcement agents must be viewed in their totality. *U.S. v. Magluta*, 44 F.3d 1530, 1533–37 (11th Cir. 1995) (affirming the district court's probable cause determination that a residence was, in fact, the suspect's). The probable cause determination has been called a "practical, common-sense decision." *U.S. v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006). The test is an objective one and focuses on the facts as they appeared. *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003). The principal components of the determination will be the events leading up to the search and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *U.S. v. Ellis*, 499 F.3d 686, 689 (7th Cir. 2007).

## ANALYSIS

The Court is well aware that law enforcement is a difficult job, and police officers must often make split-second judgments in tense, uncertain, and rapidly evolving circumstances. *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009). Nevertheless, the Fourth Amendment "has drawn a firm line at the entrance" to an

individual's home.  *Payton*, 445 U.S. at 590.  "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.*

In this case, officers had a warrant, but it was an *arrest* warrant for someone who did not live in the apartment they entered.  Officers did not face exigent circumstances, and—even applying caselaw that has evolved to allow officers to judge whether they are entering the correct home—their entry into Defendant's apartment was unreasonable.

### 1. No Exigent Circumstances

The crux of the exigent circumstances inquiry is whether it was "reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant."  *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014).  Here, because officers already had an *arrest* warrant, the rule needs tweaking: did officers face a compelling need to act, or did they have time to make further inquiry into just whose residence they were entering?  The standard is an objective one, and focuses on agents' conduct during the entire period after they had a right to obtain a warrant.  *Id.* (citing *U.S. v. Patino*, 830 F.2d 1413, 1416 (7th Cir. 1987)).  Police "bear a heavy burden when attempting to demonstrate an urgent need that might justify" warrantless entry.  *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984).

Here, agents—who as discussed below could have easily made further inquiry into the nature of the building they were entering—faced no compelling need to act when they entered Defendant's home.  There was no risk of flight: officers initially

had the property surrounded (two agents were present in the back alley), and as some agents ascended the stairs to the second-story door, other officers covered the downstairs door.  Agent Inlow agreed that "Herman Smith wasn't going anywhere." Underscoring the lack of hurry is the fact agents took the time for one officer to fetch a battering ram before entering.  Had agents truly felt an urgent need to enter, they would have at least tried to force the door without the ram.

After officers knocked and announced their presence, nobody responded to the door, but Agent Inlow's belief that the lack of response (plus "all of the warrants and our training and intelligence stuff that we have") meant his suspect was destroying evidence does not suffice to carry the Government's heavy burden here. The Government must point to "some *affirmative* sign of exigency," and where silence could easily mean any number of things having nothing to do with exigent circumstances, it does not excuse warrantless entry.  *U.S. v. Delgado*, 701 F.3d 1161, 1165 (7th Cir. 2012).  An instructive case is *U.S. v. Ellis*, where an officer's entry based only on "reasonable type of movement that would be found in any home where there was a knock" was held insufficient to show exigent circumstances. *Ellis*, 499 F.3d at 691.

Here, as in *Ellis*, nobody proclaimed "it's the cops," threw evidence out a window, ran to another exit, or slammed any doors.  *See id.*  While the sound of a toilet flushing can create enough suspicion for warrantless entry into a house where drugs are suspected to exist, *id.,* here officers only heard Defendant's toilet flushing *after* their warrantless entry to the house, *see U.S. v. Jenkins*, 329 F.3d 579, 581

17

(7th Cir. 2003) (evidence discovered after warrantless entry cannot support exigent circumstances).  Defendant was under no obligation to answer his door, and absent any affirmative sign he was destroying evidence, officers had no compelling reason to enter his apartment.  As the Supreme Court commented in a recent exigent circumstances case:

> [W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak … [H]e may decline to listen to the questions at all and may go on his way.

*Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011) (internal quotation and citation omitted).  *See also U.S. v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) (officers cannot, "without some other suspicious activity, justify a warrantless entry based solely on the fear that evidence might be destroyed … If [a] mere possibility that evidence will be destroyed were enough, then the" warrant requirement would have little meaning in investigating drug crimes) (internal quotation and citation omitted); *Moya v. United States*, 761 F.2d 322, 325 (7th Cir. 1984) ("We must be especially cautious when the evidence that is alleged to establish probable cause is entirely consistent with innocent behavior.").

Exigent circumstances may be shown only by concrete facts—not hunches. *U.S. v. Arch*, 7 F.3d 1300, 1304 n. 3 (7th Cir. 1993).  The exigent circumstances exception to the warrant requirement does not apply in this case.

### 2. Even if *Steagald* does not Strictly Apply, Officers Lacked Probable Cause to Believe Upstairs Apartment was the Suspect's

In cases where officers mistakenly use an arrest warrant to enter a third party's home, the federal Courts of Appeal—except for the Seventh Circuit—have clearly articulated rules that allow some room for an officer's determination of whether there is cause to enter the residence. Though respect for those appellate courts makes it prudent to analyze this case in the alternative according to more recent applications of *Steagald*, the undersigned is convinced that the holding in this case is compelled by *Steagald* and *U.S. v. Patino*.

### A. *Steagald* and *Patino* Render Officers' Entry Unconstitutional

In *Patino*, the Seventh Circuit applied *Steagald* to facts similar to the instant case. Agents who were authorized to arrest a suspect named Richard entered the home of a woman named Patino. *Patino*, 830 F.2d at 1414. Those agents did not have exigent circumstances for the entry, and the Court held that the warrantless entry was clearly unconstitutional. "In *Steagald*," the panel reasoned, "the Supreme Court held that absent exigent circumstances or consent, a search warrant is required to enter and search a third person's home for a fugitive named in an arrest warrant." *Patino*, 830 F.2d at 1415. "Because the arrest warrant does not protect the third person's privacy interest in being free from an unreasonable invasion and search of his home, a search of a third person's home based solely on such a warrant is unconstitutional." *Id.* (citing *Steagald*, 451 at 212–16).

*Steagald* itself hinged on likening a third-party's privacy interests to those protected by search warrants, not arrest warrants. *Steagald*, 451 U.S. at 212–13.

19

And *Steagald*'s rule allowed no inquiry into officer belief: an arrest warrant is inadequate to protect the Fourth Amendment interests of persons not named in the warrant "when their homes are searched without their consent and in the absence of exigent circumstances"—full stop. *Id.* at 212.

Here, neither consent nor exigent circumstances existed, and entry into Defendant's home was made based on the authority of an arrest warrant for another person. The question therefore "calls for a straightforward answer because the law is clear." *Patino*, 830 F.2d at 1415. The arrest warrant "did absolutely nothing" to protect Defendant's privacy interests, and warrantless entry into his home was unconstitutional. *Steagald*, 451 U.S. at 213.[8]

### B. Alternatively, No Probable Cause to Believe Defendant's Residence was In Fact Suspect's Residence

Assuming *arguendo* that this case is distinguishable from *Steagald* in any meaningful way, the Court holds that officers acted unreasonably in failing to investigate whether the freestanding building comprised more than one apartment, and accordingly lacked probable cause to believe the upstairs apartment belonged to Herman Smith.

In *U.S. v. Shaw*, the Sixth Circuit held a home entry unconstitutional when officers did nothing to clarify precisely where the subject of an arrest warrant lived. *Shaw*, 707 F.3d 666, 667 (6th Cir. 2013). The arrest warrant named Phyllis Brown,

---

[8] Though *Steagald* and *Patino* are precedent from the 1980s, neither has been overruled. Even considering the persuasive weight of the eleven Courts of Appeal who now include officers' belief in the calculus, the undersigned is bound to follow them as direct precedent. *See Grayson v. Schuler*, 666 F.3d 450, 453 (7th Cir. 2012) ("[W]e're not supposed to declare a decision by the Supreme Court overruled unless the Court itself makes clear that the case *has* been overruled, even if we're confident that the Court would overrule it if the occasion presented itself.") (emphasis there).

a resident of 3171 Hendricks Avenue.  *Id.*  No houses were marked 3171, but two houses were marked 3170.  *Id.*  Officers entered the house they saw was occupied, and gave several other reasons for picking one residence over the other, including: a woman answered the door; that woman closed the door upon seeing the officers; and officers had a fifty-fifty chance of being right.  *Id.* at 667–68.  None of the reasons— "singly or cumulatively"—was reasonable.  *Id.* at 668.  That a house is occupied "says nothing about its address or whether the object of an arrest warrant lives there."  *Id.*  That the person at the door was (like the suspect) a woman "proves nothing."  *Id.*  That the woman closed the door could spark suspicion "the woman was up to no good, but it [did] not make her Phyllis Brown … [and] it [did] not make the house 3171 Hendricks."  *Id.*  And officers' even odds of being right—odds tainted by their refusal to make simple inquiries as to which residence was which—were an insufficient basis for obtaining entry into the house.  *Id.*

Here, the events leading up to the search did not amount to probable cause to believe the threshold being crossed belonged to Herman Smith.  There were obvious signs the freestanding building comprised two units rather than one.  Outside access to a second-floor door is in itself an indication of separate units, *Guzman,* 565 **F.3d at 397–98**, and to walk up those stairs officers had to pass within feet of (what would have at that point been a very visible) downstairs door on the same side of the house.  Though officers viewing the freestanding building from the back of Gardner's house would have had their view of the downstairs door obscured by hedges, they certainly knew about it by the time they approached Defendant's

second-story door: two agents guarded that downstairs door while officers entered Defendant's apartment. *See Guzman*, 565 F.3d at 397 ("Although the officers thought the building looked like a single-family house, they should have known pretty quickly that their belief was mistaken").

Agent Inlow admitted the building's layout "gave us pause," and that he "had no information that it was one residence, two residence, four residences … we had no idea what the layout of the building was." Inlow's hesitation was well-founded: officers executing an arrest warrant are obliged to take steps to reasonably ensure they are not entering the wrong home. *El Bey*, 530 F.3d at 416. And the information necessary to determine *both* the building's layout *and* where Herman Smith lived was at agents' fingertips. *See Shaw*, 707 F.3d at 668 (criticizing officers' failure to pursue easily available clarifying information as "one more self-imposed shroud of ignorance that made other potential clues look more salient than they were."). But rather than perform a cursory inquiry, officers broke the door down.

Agents did see Defendant (who at a brief glance does resemble Smith) peek out a window, but they were at least forty feet away and the sun had not yet risen. Agent Inlow's belief that the head peeking out the window belonged to Herman Smith was based only that split-second look, a comment that Smith "stayed out back,"[9] and a driver's license photo—he had not personally witnessed any of Smith's

---

[9] Of course, Rochelle Gardner claims to have told Inlow that Smith lived "in the back apartment *downstairs* with [Gardner's] son." Since agents lacked probable cause in any event, the analysis here gives Inlow the benefit of the doubt as to whether he heard Gardner imply the freestanding building had two apartments. If the standard for officers' entry were *lower* than probable cause, the

controlled buys.  *See Nelson v. City of Chi.*, No. 08 C 4754, 2010 WL 1978610, at *5 (N.D. Ill. May 14, 2010) ("Whether [officers] got a 'good enough look' at the suspect is only one factor in the probable cause analysis.").  That a short-haired African-American man was home at 6:00 a.m. in Madison, Illinois[10]—as in *Shaw*—"says nothing about [the] address" and, in light of the confusion regarding the layout of the freestanding building, "proves nothing" about who actually resides there.  *Shaw*, 707 F.3d at 668.

More importantly, any ambiguity about the nature of the apartment building could have evaporated by appealing to the knowledge of people literally within shouting distance.  Officers in the back alley—just around a corner from officers entering the door—could see the building had two utility meters rather than one: Gardner testified those meters are visible to people standing outside the property. Likewise, those agents could have confirmed there were no exits on the back of the building.  A two-story building with only two egress points—one upstairs and one downstairs, stacked nearly atop each other—would be an odd layout for a single-family home, and could more reasonably be assumed to be a multi-unit structure. *See Shaw*, 767 F.3d at 668 (even odds of entering the correct residence an insufficient basis for entering house).  The officer still in Gardner's house could have asked her about the freestanding building's layout.  In short, given the obvious

---

undersigned would perhaps be forced to make a factual determination whether Gardner's or Inlow's description of events was more accurate.

[10] Madison's population in 2010 was well over 50% African-American.  *See* Madison City, Illinois, *American Fact Finder*, http://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml (last visited February 9, 2015).

indicia of a two-unit building, officers *should have* known the freestanding building had more than one apartment.

Finding probable cause in this arrest warrant case would be perversely divergent with well-established search warrant precedent.  In executing a search warrant, when officers know or should know that their presumably specific description of where to search—the locale vetted for probable cause by a magistrate—is actually ambiguous, they are obligated to stop.  **Hinton**, **219 F.2d at 326;** **Jones**, **425 F.3d at 463–64.**  Officers who knew *or should have known* that what they thought was one apartment was in fact two must cease their search immediately, **Garrison**, **480 U.S. at 85;** whether two residences are in two separate houses or (as here) two units in the same building makes no difference, **Jacobs**, **215 F.3d at 767.**

Officers here, as discussed above, should have known there were two residences in the freestanding building—i.e., that they did not have probable cause for entering either residence.  Had they been serving a search warrant this would not be a close case: they would have had to stop as soon as they realized there were *any* other residences at 1516 Second Street.  **See Hartsfield v. Lemacks**, **50 F.3d at 955 ("[A]ll reasonable police officers should have known that … searching the wrong residence [while] doing nothing to make sure" they were searching the right one "violated the law.").**  Holding officers had probable cause in an arrest warrant case where they would clearly not have probable cause for a search warrant would create different understandings of "probable cause" as it pertains to home entry.

Dissonant definitions would add confusion, not clarity, to future cases and to day-to-day law enforcement practices.

Rather than take reasonable steps to investigate the nature of the building they were entering—steps they had time to take, and which would have almost certainly led them to the correct apartment—officers entered Defendant's residence. They did not have probable cause to believe it was their suspect's residence, so the home entry was unconstitutional.

## CONCLUSION

Government agents did not face exigent circumstances while serving an arrest warrant on Herman Smith.  Under a plain reading of *Steagald*, that arrest warrant did "absolutely nothing" to protect Darrell Williams' Fourth Amendment rights.  Even under more modern (if less authoritative) jurisprudence, officers did not have probable cause[11] to believe the suspect named in their arrest warrant resided in the second-floor apartment that—it turns out—belonged to Defendant. Their entry into Defendant's apartment violated the Fourth Amendment.

The Government offers no other reason why the exclusionary rule should not apply, so Defendant's Motion to Suppress (**Doc. 26**) is **GRANTED**.

**IT IS SO ORDERED.**
**DATE: <u>February 9, 2015</u>**

<u>s/ *Michael J. Reagan*</u>
**MICHAEL J. REAGAN**
Chief Judge
UNITED STATES DISTRICT COURT

---

[11] The Court makes no finding whether officers held a "reasonable belief," insofar as some circuit courts use the term to describe a standard lower than probable cause, that Smith lived in the second-story apartment.